# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALTERA CORPORATION & SUBSIDIARIES,
*Petitioner – Appellee,*

v.

COMMISSIONER OF INTERNAL REVENUE,
*Respondent – Appellant.*

Appeal from the United States Tax Court, Nos. 6253-12, 9963-12

## SUPPLEMENTAL BRIEF FOR THE APPELLEE

Thomas Kittle-Kamp
William G. McGarrity
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

A. Duane Webber
Phillip J. Taylor
Joseph B. Judkins
BAKER & MCKENZIE LLP
815 Connecticut Avenue NW
Washington, DC 20006
Telephone:(202) 452-7000
Facsimile: (202) 452-7074

Donald M. Falk
MAYER BROWN LLP
3000 El Camino Real #300
Palo Alto, CA 94306
Telephone: (650) 331-2000
Facsimile: (650) 331-2060
dfalk@mayerbrown.com

Brian D. Netter
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

*Counsel for the Appellee*

# CORPORATE DISCLOSURE STATEMENT

Intel Corporation is the parent corporation of Altera Corporation and subsidiaries. Intel is a publicly traded corporation.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .............................................. i

TABLE OF AUTHORITIES ....................................................................... iii

INTRODUCTION ............................................................................................ 1

ARGUMENT ...................................................................................................... 5

    I.    The Final Rule Is Invalid Because It Was Not The Product Of Reasoned Decisionmaking .................................. 5

        A.    Chenery precludes the Commissioner's effort to rescue the Final Rule by presenting new rationales ....................................................................... 5

        B.    The Final Rule cannot be sustained on its own terms ................................................................................. 12

    II.    The Final Rule Is Invalid Because It Rests On An Unreasonable Interpretation Of The Statute ..................... 24

        A.    The purpose of Section 482 is to achieve tax parity between controlled-party transactions and uncontrolled-party transactions ................................ 25

        B.    The interpretation here is unreasonable when measured against recognized statutory meaning ...... 28

CONCLUSION ................................................................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*California Pub. Util. Comm'n v. Federal Energy Regulatory Comm'n,*
879 F.3d 966 (9th Cir. 2018) .......................................................... 6, 21

*Clean Air Council, Inc. v. Pruitt,*
862 F.3d 1 (D.C. Cir. 2017) ................................................................ 6

*Commissioner v. First Sec. Bank of Utah,*
405 U.S. 394 (1972) ............................................................. 26, 27, 28

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,*
538 F.3d 1172 (9th Cir. 2008) .......................................................... 23

*Ctr. for Biological Diversity v. Zinke,*
900 F.3d 1053 (9th Cir. 2018) .......................................................... 17

*Delaware Riverkeeper Network v. U.S. Army Corps of Eng'rs,*
869 F.3d 148 (3d Cir. 2017) ............................................................. 10

*Encino Motorcars, LLC v. Navarro,*
136 S. Ct. 2117 (2016) ................................................................ 21, 24

*Exxon Mobil Corp. v. Allapattah Servs., Inc.,*
545 U.S. 546 (2005) ......................................................................... 29

*FCC v. Fox Television Studios,*
556 U.S. 502 (2009) ......................................................................... 20

*Fla. Bankers Ass'n v. U.S. Dep't of the Treasury,*
799 F.3d 1065 (D.C. Cir. 2015) ........................................................ 13

*Frank v. International Canadian Corp.,*
308 F.2d 520 (9th Cir. 1962) ...................................................... 26, 27

*Good Fortune Shipping SA v. Comm'r,*
  897 F.3d 256 (D.C. Cir. 2018) ..................................................... *passim*

*Great Basin Resource Watch v. Bureau of Land Management,*
  844 F.3d 1095 (9th Cir. 2016) ..................................................... 15, 21

*Grenada Indus., Inc. v. Comm'r,*
  17 T.C. 231 (1951) .................................................................. 27

*Hill-Rom Servs., Inc. v. Matal,*
  716 F. App'x 996 (Fed. Cir. 2017) ................................................ 11

*Humane Soc'y v. Locke,*
  626 F.3d 1040 (9th Cir. 2010) ..................................................... 24

*Loving v. IRS,*
  742 F.3d 1013 (D.C. Cir. 2014) ................................................... 25

*Maze v. IRS,*
  862 F.3d 1087 (D.C. Cir. 2017) ................................................... 13

*Merkel v. Comm'r,*
  192 F.3d 844 (9th Cir.1999) ......................................................... 3

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual*
  *Automobile Insurance Co.,*
  463 U.S. 29 (1983) ............................................................. 12, 13, 14

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
  545 U.S. 967 (2005) .................................................................. 21

*Oil Base, Inc. v. Comm'r,*
  362 F.2d 212 (1966) ................................................................. 27

*Pac. Nw. Generating Co-op. v. Dep't of Energy,*
  580 F.3d 792 (9th Cir. 2009) ....................................................... 25

*Recinos De Leon v. Gonzales,*
  400 F.3d 1185 (9th Cir. 2005) ............................................ 11

*SEC v. Chenery Corp.,*
  318 U.S. 80 (1943) ................................................... *passim*

*Seminole Flavor Co. v. Commissioner,*
  4 T.C. 1215 (1945) ...................................................... 27

*Sierra Club v. EPA,*
  884 F.3d 1185 (D.C. Cir. 2018) ........................................ 17

*St. Vincent Randolph Hospital v. Price,*
  869 F.3d 510 (7th Cir. 2017) ........................................... 23

*Turlock Irrigation Dist. v. FERC,*
  2018 WL 4224434 (9th Cir. Sept. 6, 2018) ......................... 13

*Xilinx Inc. & Subsidiaries v. Comm'r,*
  125 T.C. 37 (2005) ..................................................... 10

*Xilinx Inc. v. Commissioner,*
  598 F.3d 1191 (9th Cir. 2010) .................................... 22, 27

*Zimmerman v. Oregon Dep't of Justice,*
  170 F.3d 1169 (9th Cir. 1999) ......................................... 29

**STATUTES AND REGULATIONS**

26 U.S.C. § 7421 ............................................................ 13

Treas. Reg. § 1.482-1 ....................................................... 32

Treas. Reg. § 1.482-1(a)(1), (b)(1) ...................................... 32

Treas. Reg. § 1.482-1(b)(1) ........................................... 22, 26

Treas. Reg. § 1.482-1(b)(2)(i) (2003) ................................... 23

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Treas. Reg. § 1.482-2(a)(2)(iii) ...................................................... 22

Treas. Reg. § 1.482-4(c) ............................................................... 18

Treas. Reg. § 1.482-4(f)(2)(i) .................................................. 32, 34

Treas. Reg. § 1.482-4(f)(2)(ii) ...................................................... 34

Treas. Reg. § 1.482-7 .................................................................... 23

Compensatory Stock Options Under Section 482,
68 Fed. Reg. 51,171 (Aug. 26, 2003) ......................................... *passim*

## OTHER AUTHORITIES

H.R. Conf. Rep. No. 99-481, at II-638 (1986) .................................. 9, 30

H.R. Rep. No. 99-426 (1985) ............................................................ 9

I.R.S. Notice 88-123, 1988-2 C.B. 458 ............................................ 27

# INTRODUCTION

The Commissioner's defense of the Final Rule flouts core principles of administrative law. To begin with, his principal argument bears no resemblance to Treasury's justification for promulgating the rule, and so cannot sustain the Rule under *SEC v. Chenery Corp.*, 318 U.S. 80 (1943).

To support allocating stock-based compensation among related companies that enter into cost-sharing arrangements, Treasury told the world that it was applying the arm's-length standard, which turns on evidence of unrelated-party conduct in similar circumstances. On the facts, the Preamble dismissed or ignored uncontroverted evidence that unrelated parties would never share stock-based compensation. But the Tax Court found, in a 15-0 opinion, that the evidence mattered, and concluded that Treasury's efforts to dodge the administrative record violated the Administrative Procedure Act (APA).

The Commissioner does not challenge the Tax Court's determination that Treasury's reasoning was contrary to all evidence about arm's-length behavior. Instead, he insists that, without saying so, Treasury applied a "purely internal" analysis that would fundamentally

transform tax law by removing evidence from a Section 482 analysis of cost-sharing. That "purely internal" approach is justified, the Commissioner says, because the addition of the commensurate-with-income standard to Section 482 allows the Commissioner to ignore all evidence of unrelated-party conduct.

Yet neither the Preamble nor the Notice of Proposed Rulemaking announced that a new, "purely internal" analysis made evidence of arm's-length conduct "irrelevant" (in the words of the withdrawn opinion of Chief Judge Thomas). Withdrawn Op. ("Wdwn. Op.") 34, 39. The Commissioner cannot explain why the 15 tax specialists on the Tax Court concluded that the Preamble did "not justify the final rule on the basis of any modification or abandonment of the arm's-length standard" (ER53) and did not rely on the commensurate-with-income provision independently from arm's-length analysis (ER57-59). He cannot explain the Tax Court's conclusion that, had Treasury contemplated such a significant change in the arm's-length standard, it would have had to acknowledge and explain the change—but didn't. ER59 n.19. These are

areas where the Tax Court's "special expertise" warrants "respect." *Merkel v. Comm'r,* 192 F.3d 844, 847-48 (9th Cir. 1999). [1]

As the withdrawn opinion of Judge O'Malley explained, the Commissioner seeks an outcome that would "stretch[] 'highly deferential' review … beyond its breaking point." Wdwn. Op. 47 (citations omitted). To accept the Commissioner's position that Treasury articulated an evidence-free approach, the Court would have to disregard 30 references to the arm's-length standard—plus the agency's *ipse dixit* assurance that the Rule's approach *satisfied* that standard. The Court would have to accept that Treasury silently abandoned repeated assurances that the commensurate-with-income standard did *not* displace the arm's-length standard.  The Court would have to account for Treasury's insistence—through binding regulation—that the arm's-length standard continues to apply to all adjustments under Section 482, even though, as Judge O'Malley pointed out, the Commissioner's present argument is "that what Treasury was *actually* saying is that § 482 no longer requires an arm's length analysis."

---

[1] As striking is the conflict between the Tax Court's view of the history of Section 482 (ER4-17) and the presentation in the withdrawn opinion of Chief Judge Thomas (at 12-23).

Wdwn. Op. 53. And to support those logical leaps, the Court could rely only upon Treasury's passing citation to the legislative history of the commensurate-with-income amendment.

Because the Final Rule is not the product of reasoned decisionmaking, it is invalid. It is independently invalid because Treasury's interpretation of Section 482 is not reasonable (let alone correct, as it would have to be without *Chevron* deference). At oral argument, the Commissioner claimed authority to completely disregard unrelated-party conduct *only* for cost-sharing arrangements to develop intangibles, and not for licenses or transfers. This stands the second sentence of Section 482 on its head. The commensurate-with-income standard applies *only* to a "license or transfer"—and only to the extent consistent with arm's-length behavior. But no "license or transfer" is involved in arrangements to share the costs of developing new intangibles, which become the property of the sharing parties as soon as the intangibles come into being. Moreover, the Commissioner's position—that evidence doesn't count for cost-sharing, but does count for licenses and transfers—gives the commensurate-with-income standard unrebuttable force where it does not apply at all.

As shown below, the Commissioner seeks to escape legal principles, reaffirmed by this Court and others, that ensure that agency decisionmaking is reasonable, informed, and lawful. The Commissioner insists that Treasury stealthily cast aside the arm's-length standard that the Preamble purported to apply. An agency cannot work such fundamental change without publicly declaring its intention and responding to any resulting outcry. Because Treasury did neither, this Court should affirm the Tax Court's unanimous rejection of the Final Rule.

## ARGUMENT

## I. The Final Rule Is Invalid Because It Was Not The Product Of Reasoned Decisionmaking.

The Tax Court's decision makes clear that the Final Rule cannot be defended on Treasury's reasoning in the Preamble, and the Commissioner does not even try. Instead, he offers this Court a new and different rationale. *Chenery* precludes that approach, and the Final Rule fails additional requirements of reasoned decisionmaking.

### A. *Chenery* precludes the Commissioner's effort to rescue the Final Rule by presenting new rationales.

After the Tax Court declared the Final Rule invalid, the Commissioner pivoted to rely solely on his post-rulemaking contention

that section 482's arm's-length standard was satisfied whether or not the Final Rule comported with arm's-length conduct. He now claims that the "commensurate with income" standard authorizes a "purely internal" approach that somehow achieves an arm's-length result. Comm'r Br. 51.

A rule can be sustained only on "grounds articulated by the agency" in the rulemaking—not on "appellate counsel's *post-hoc* rationalizations." *California Pub. Util. Comm'n v. Federal Energy Regulatory Comm'n*, 879 F.3d 966, 978 n.5 (9th Cir. 2018) ("*CPUC*"); *accord Good Fortune Shipping SA v. Comm'r*, 897 F.3d 256, 263 (D.C. Cir. 2018). That is so even when the agency "sens[es] the flimsiness" of its original claim. *Clean Air Council, Inc. v. Pruitt*, 862 F.3d 1, 11 (D.C. Cir. 2017).

Treasury did not believe that it could dispense with an analysis of arm's-length behavior. The Preamble tried to square the Final Rule with the "absence of evidence that parties at arm's length take stock-based compensation into account in similar circumstances." Compensatory Stock Options Under Section 482, 68 Fed. Reg. 51,171, 51,172 (Aug. 26, 2003). Acknowledging the importance of "results

actually realized in similar transactions," *id.* at 51,171-72, Treasury nevertheless rejected the evidence of arm's-length behavior submitted by commenters in favor of a thought experiment about what arm's-length parties "generally would … agree to do" in cost-sharing arrangements for "high-profit intangibles" where stock-based compensation was a "significant element." *Id.* at 51,173. Treasury chose an imaginary cost-sharing agreement between pharmaceutical companies over the real one in the administrative record, which Treasury rejected on inaccurate grounds. *See* ER32, ER60-61.

The 15 specialist judges on the Tax Court unanimously understood that Treasury had not sought to "justify the final rule on the basis of any modification or abandonment of the arm's-length standard." ER53. The Tax Court likewise found nothing in the administrative record suggesting that "an evidentiary inquiry was unnecessary." ER54 n.15. And the court noted that Treasury "relied *exclusively* on the arm's-length standard" to rebut the many comments opposing the rule. ER57 n.17.

The withdrawn opinion of Chief Judge Thomas (at 31) nonetheless concluded that the Final Rule adequately articulated the new rationale

by making "references" to the legislative history of the commensurate-with-income amendment. Through those "references," the opinion maintained, "Treasury communicated its understanding that Congress had called upon it to move away from the traditional arm's length standard" (*id.*), and gave the public "adequate notice" that "Treasury understood § 482 to authorize it to employ a purely internal, commensurate with income approach in dealing with related companies" (*id.* at 37).

Those references communicated nothing of the sort. After claiming that the new rule "is consistent with the legislative intent underlying section 482 and with the arm's length standard" (68 Fed. Reg. at 51,172), the Preamble paraphrases the 1986 legislative history:

> The legislative history of the Tax Reform Act of 1986 expressed Congress's intent to respect cost sharing arrangements as consistent with the commensurate with income standard, and therefore consistent with the arm's length standard, if and to the extent that the participants' shares of income "reasonably reflect the actual economic activity undertaken by each."

*Id.* (citing H.R. Conf. Rep. No. 99-481, at II-638 (1986)). And it paraphrases another passage saying that "there is little, if any, public data regarding transactions involving high-profit intangibles." *Id.* at

51,173 (citing H.R. Rep. No. 99-426, at 423-25 (1985)). That's it. Neither there nor anywhere else in the Preamble—or, indeed, the legislative history—is there any reference to the Commissioner's "purely internal" analysis.

If Treasury actually had used the Commissioner's *post hoc* reasoning, the Preamble would have looked very different. Treasury would have dismissed the public comments as legally irrelevant, rather than disputing whether the evidence submitted was truly comparable. Wdwn. Op. 61 (O'Malley, J.). Indeed, if Treasury really had proposed to interpret the "commensurate with income" standard to "dispense with arm's length analysis entirely" (*id.* at 59), then the 417 pages of comments (including attachments, SER13-429) surely would have addressed the agency's authority to do so.

As the Tax Court observed, Treasury had "repeatedly reinforced" the conclusion that "Congress intended for the commensurate-with-income standard to work consistently with the arm's-length standard." ER58. But "[t]he preamble to the final rule does not indicate that Treasury intended to abandon this conclusion." ER58-59.

Treasury's passing reference to the legislative history is the type of "single, undeveloped statement" that cannot sustain a rationale that is explicated for the first time on appeal. *Good Fortune*, 897 F.3d at 262; *see also Delaware Riverkeeper Network v. U.S. Army Corps of Eng'rs*, 869 F.3d 148, 160 (3d Cir. 2017) (*Chenery* precludes agency reliance on single passing reference to lack of "reasonable or practical alternatives" because "the agency did not articulate any reasoning in support of that conclusion").

The Commissioner previously argued in this Court that the public could have intuited Treasury's position based upon the Commissioner's litigating position in *Xilinx* and other controversies. *See* Reply Br. 32-33. But the public could hardly be expected to guess that Treasury had made this change in policy when the rulemaking itself purported to ground the Final Rule in an evaluation of the evidence under the arm's-length standard. And in *Xilinx* itself, the Commissioner *did* present evidence, albeit evidence that the Tax Court rejected. *Xilinx Inc. & Subsidiaries v. Comm'r*, 125 T.C. 37, 58-61 (2005). Ironically, having failed to make his point with evidence presented against one taxpayer,

the Commissioner now seeks to impose a general rule binding on all taxpayers, with no supporting evidence at all.

Taxpayers could not have "reasonably discerned" (Wdwn. Thomas Op. 37) a "purely internal" approach. To the contrary, Treasury only "set forth its understanding that it should not examine comparable transactions *when they do not in fact exist*." Thomas Op. 32 (emphasis added). But that is quite different from saying that Congress made comparable transactions irrelevant.

Requiring an agency to "show its work" (Wdwn. O'Malley Op. 62) is not "excessive proceduralism" (Wdwn. Thomas Op. 33). By ensuring that courts need not "guess at the theory underlying" an agency's action (*Recinos De Leon v. Gonzales*, 400 F.3d 1185, 1189 (9th Cir. 2005) (internal quotation marks omitted)) or "assume" that the agency "meant one thing when it said something else" (*Hill-Rom Servs., Inc. v. Matal*, 716 F. App'x 996, 1004 (Fed. Cir. 2017)), *Chenery* imposes critical safeguards on the vast powers of the administrative state.

There is no way to predict how Treasury would have acted if confronted with evidence that "mov[ing] away from the traditional arm's length standard" (Wdwn. Op. 31) would impose unexpected

consequences on U.S. companies doing business abroad—*e.g.*, by freeing foreign authorities to use their own "purely internal" income allocation approaches, insulated from any challenge based upon evidence of arm's-length behavior. Recall how quickly Treasury acted to reassure the international tax community that the commensurate-with-income standard would not supplant the arm's-length standard. *See* ER21-23; Altera Br. 11-12, 69-70.

More broadly, interpreting *Chenery* to permit the substitution of new rationales for rulemaking would foster gamesmanship by permitting agencies to effect controversial policy changes without candidly revealing their intentions. The Court should reject the Commissioner's tardy new basis for the Final Rule.

## B. The Final Rule cannot be sustained on its own terms.

The Tax Court held unanimously that, in promulgating the Final Rule, Treasury failed in several ways to satisfy the reasoned-decisionmaking requirement of *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983). As Judge O'Malley noted (Wdwn. Op. 62), the Commissioner "offers no response to these findings." That alone justifies affirming the Tax

Court's conclusion that the Final Rule is unenforceable—but in any event, the Tax Court's well-reasoned opinion was correct. The Final Rule fell far short of the "reasoned decisionmaking" that *State Farm* requires. *See, e.g., Turlock Irrigation Dist. v. FERC*, 2018 WL 4224434, at *9 (9th Cir. Sept. 6, 2018).[2]

### 1. The Preamble's conclusory reasoning conflicted with the administrative record.

To begin with, Treasury failed to "articulate a … rational connection between the facts found and the choice made" (*State Farm*, 463 U.S. at 43 (internal quotation marks omitted))—because it found no "facts" at all. Section 482 has always required an intensely factual analysis of what unrelated parties would do when transacting in sufficiently similar circumstances *See* Altera Br. 39-40; ER52. Yet the

---

[2] The withdrawn opinion of Chief Judge Thomas (at 26 & n.6) questioned the applicability of the APA to post-enforcement challenges to regulations. Although *some* regulations must be challenged when promulgated, the government has long successfully argued that the Anti-Injunction Act "generally bars pre-enforcement challenges to certain tax statutes and regulations" and "requires plaintiffs to instead raise such challenges in refund suits after the tax has been paid, or in deficiency proceedings." *Fla. Bankers Ass'n v. U.S. Dep't of the Treasury*, 799 F.3d 1065, 1066 (D.C. Cir. 2015); *Maze v. IRS*, 862 F.3d 1087, 1091-93 (D.C. Cir. 2017); *see* 26 U.S.C. § 7421. Taxpayers must be able to raise APA arguments in post-enforcement proceedings; otherwise, tax regulations would be effectively immune from APA scrutiny.

Preamble acknowledged that Treasury was proceeding with the Final Rule despite finding *no* evidence that parties developing intangibles at arm's length would share stock-based compensation. 68 Fed. Reg. at 51,172-73.

There not only was an "absence of evidence that unrelated parties share the same costs when dealing at arm's length," Wdwn. Op. 7, but unrebutted evidence that they do not. Indeed, the Tax Court observed, "'every indication in the record'" weighed against Treasury's conclusion. ER61 (quoting *State Farm*, 463 U.S. at 57). In particular, the Tax Court found, multiple commenters "identified arm's-length agreements in which stock-based compensation was not shared or reimbursed." ER32; *see* ER67-68. That and other evidence demonstrated that unrelated parties do not share stock-based compensation in cost-sharing arrangements involving high-profit intangibles or in any other type of agreement. ER32-33; ER67-71. Experts explained *why* unrelated parties acting at arm's length would not share stock-based compensation. ER70-72. As Judge O'Malley noted, "The fact that evidence of comparable transactions might support more favorable tax

treatment does not mean such comparables do not exist." Wdwn. Op. 61. And the Tax Court found that they did exist. ER68-69.

But as the Commissioner stipulated in the Tax Court, Treasury did not bother looking for any facts about arm's-length behavior that might support its belief. Altera Br. 24-25 (citing ER123-27). "Treasury could not have rationally concluded that this is a proposition 'for which scant empirical evidence can be marshaled' … without attempting to marshal empirical evidence in the first instance, which [Treasury] concedes it did not do." ER62.

Treasury's unsupported belief provides even less basis for a conclusion than was offered in *Great Basin Resource Watch v. Bureau of Land Management*, 844 F.3d 1095 (9th Cir. 2016), where this Court invalidated the Bureau of Land Management's decision to approve a mining operation on public land. There, the Court held that a "bare assertion of opinion" by an expert within the Bureau, "without any supporting reasoning," did not "pass muster" to sustain the agency's decision. *Id.* at 1103. Here, Treasury did not marshal any opinion from an internal economist or other expert as to what parties acting at arm's length would do in similar circumstances.

As the Tax Court recognized (ER67-70; ER73-74), Treasury had no sound basis for its concern that the agreements and other evidence in the administrative record "may not" be sufficiently similar to transactions involving so-called "high-profit intangibles" (68 Fed. Reg. at 51,173). In any event, Treasury's purported concern missed the mark. Whether one transaction is sufficiently similar to another is not a binary inquiry: evidence derived from arm's-length dealings can be used to answer a specific question posed by Section 482—*e.g.*, whether parties acting at arm's length would share stock-based compensation— even if the data provide less guidance for royalty rates or other topics. Here, all evidence and expert opinion demonstrated that unrelated parties acting at arm's length do not and would not share stock-based compensation in any type of transaction—not in cost-sharing arrangements, not in services agreements, not in contracts with the federal government, nowhere.

Despite this evidence, Treasury offered unsubstantiated, counterfactual assertions about how unrelated parties behave. Under this Court's precedent, an agency "act[s] in an arbitrary and capricious manner" when it ignores available data that contradict its conclusion.

*Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1068 (9th Cir. 2018) (agency "ignor[ed] available biological data" that contradicted its conclusion); *see also Sierra Club v. EPA*, 884 F.3d 1185, 1196 (D.C. Cir. 2018) (refusing to sustain agency action when EPA neither said that it was relying on the theory later advanced before the court "nor … explained how any such theory follows from the only available record evidence"). That failing alone renders the Final Rule unenforceable.

2. **The Final Rule's current justification—that empirical arm's-length analysis is unnecessary when cost-sharing agreements are at issue— marks an unexplained and unacknowledged change in Treasury's longstanding position.**

The Final Rule also cannot stand because the agency's current justification marks a dramatic and unacknowledged change from Treasury's prior legal position, a change that is not even mentioned, let alone explained or justified in the Preamble. On the contrary, the Preamble acknowledged that "the results actually realized in similar transactions under similar circumstances ordinarily provide significant evidence" as to whether the arm's-length standard is satisfied. 68 Fed. Reg. 51,172–51,173. That reflected Treasury's long-standing position

that the arm's-length standard governs every Section 482 case, and that evidence of unrelated-party conduct is central to the inquiry.

Here, the Commissioner argues that the evidence Treasury actually analyzed in the Preamble was irrelevant because "the arm's length standard does *not* require[] an analysis of what unrelated parties do under comparable circumstances." Comm'r Br. 57 (emphasis in original; internal quotation marks deleted). This attempt to distinguish the arm's-length standard from "comparability analysis" is contrary to the reasoning actually used in the Preamble and breaks with Treasury's longstanding administrative position.

In all cases, the statutory arm's-length standard asks how unrelated parties would behave if they engaged in a sufficiently comparable transaction negotiated at arm's length. As Treasury has long recognized, one method of answering this question is by locating comparable uncontrolled *transactions*, e.g., licenses between two unrelated parties, sometimes loosely referred to as "comparables." *See*, *e.g.*, Treas. Reg. § 1.482-4(c). But in addressing congressional concern about the potential inappropriate use of insufficiently comparable *transactions*, Treasury did not promulgate "purely internal" pricing

methods, divorced from the real world, but instead vastly expanded the universe of "comparability" analysis to include evidence of comparable *profits* and similar measures of economic returns derived from facts about sufficiently similar uncontrolled-party dealings. *See* Altera Br. 50-51.[3]

In all cases under the Regulations, the wide variety of uncontrolled-party data submitted by commenters in the rulemaking would be relevant to the question of how unrelated parties would behave at arm's length. Only in this litigation has the Commissioner argued that he can apply the arm's-length standard by casting aside *all* forms of evidence of uncontrolled-party behavior.

At the first oral argument in this case, the Commissioner tried to walk back the extreme views in his brief. Asked if the commensurate-with-income standard would allow Treasury to do away with all comparability analysis, the Commissioner assured the Court "certainly

---

[3] Under the current Regulations, it is everyday practice to derive valuable evidence of arm's-length behavior from financial information publicly reported in Forms 10-K and the like. But even if no useful arm's-length data were available to evaluate related-party prices, the Commissioner and taxpayers could consult with economists and similar experts to evaluate on a rigorous basis, *e.g.*, using accepted microeconomic principles and similar knowledge, what unrelated parties would do at arm's length.

not." Oral Arg. Video 11:59. To the contrary, the Commissioner affirmed that "comparability analysis is alive and well." *Id.* at 13:06. He specifically denied that he could dispense with comparability analysis in reviewing related-party transfers or licenses of intangible property—the transactions covered by the express language of the commensurate-with-income standard. *Id.* at 12:52-59. Rather, the Commissioner explained, "the only narrow context where … comparability analysis doesn't play a role is in cost-sharing arrangements." *Id.* at 17:37-45.

That startling explanation of Treasury's purported position is not even hinted at, much less explained, in the Preamble. It directly contradicts what Treasury did say.

If Treasury wanted to adopt a new position back in 2003, it had to announce that position and explain its change of heart. *FCC v. Fox Television Studios*, 556 U.S. 502, 515 (2009). The agency could not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Id.* Thus, even if the agency's oblique citation to legislative history had given notice that it was fundamentally changing its approach to Section 482, its failure to acknowledge and explain the

change makes the Final Rule unenforceable. *See* Wdwn. O'Malley Op. 61.

That is, if Treasury wanted to dispense with any analysis of arm's-length behavior—of how unrelated parties carry out business in the real world—in cases involving stock-based compensation in QCSAs, it had to say so and explain itself. It could not simply expect the taxpaying public to divine the reasons for the change in position that the Commissioner now claims was encoded in the Preamble. This kind of "'unexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" *Great Basin*, 844 F.3d at 1110 n.12 (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016), and *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)). The Final Rule thus violated the APA. *See CPUC,* 879 F.3d at 977 (agency acted arbitrarily and capriciously by "depart[ing] from [prior] policy without acknowledgment or explanation"); *Good Fortune*, 897 F.3d at 263 (IRS acted arbitrarily by abandoning prior position without explanation).

### 3. Treasury failed to reconcile the inconsistency between the Final Rule and its unchanged rule requiring use of the arm's-length standard in every case.

Even if Treasury *had* acknowledged that it was abandoning its prior position that analyzing evidence of unrelated-party dealings is required, it would have had to reconcile that decision with its regulation providing that the arm's-length standard is "the standard to be applied *in every case*" in which the Commissioner imposes an adjustment. Treas. Reg. § 1.482-1(b)(1) (emphasis added).[4] Otherwise, this Court's decision in *Xilinx Inc. v. Commissioner*, 598 F.3d 1191 (9th Cir. 2010), is dispositive.

The Final Rule purported to respect and apply that regulation, but Treasury never explained how it could do so by imposing a result contrary to all available evidence of how actual parties acting at arm's length transact or would transact. Indeed, the withdrawn opinion of Chief Judge Thomas (at 31) surmised that Treasury was "mov[ing] away from the traditional arm's length standard." If Treasury indeed intended to change its conduct in that way, however, it would have to

---

[4] Treasury offers a few elective safe harbors (*e.g.*, Treas. Reg. § 1.482-2(a)(2)(iii)), but the Commissioner cannot affirmatively adjust a taxpayer's income unless consistent with an arm's-length result.

change the regulation requiring the use of the arm's-length standard "in every case."

But Treasury did not confront the issue directly. Instead, Treasury sought to paper over the problem with so-called "coordinating" amendments declaring that Treas. Reg. § 1.482-7, which provides that stock-based compensation must be taken into account in cost sharing arrangements, "provides the specific method to be used to evaluate whether a[n arrangement] produces results consistent with an arm's length result." Treas. Reg. § 1.482-1(b)(2)(i) (2003). But this is mere agency *ipse dixit* applying the arm's-length label—and modeling adjustments under Section 482—on conduct that is directly contrary to all evidence of arm's-length conduct in any setting.

"When the agency just asserts an ipse dixit, then the decision falls for the lack of a reason." *St. Vincent Randolph Hospital v. Price*, 869 F.3d 510, 513 (7th Cir. 2017); *see also, e.g.*, *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1202 (9th Cir. 2008) (rejecting agency's "unfounded assertion" because "[n]o evidence supports" it). That result is still more necessary now because Treasury asserts the power to deprive the statutory arm's-length

standard of meaning—and to adjust the income of taxpayers in related-party transactions so they are not at parity with unrelated parties, but disadvantaged by comparison.

## II. The Final Rule Is Invalid Because It Rests On An Unreasonable Interpretation Of The Statute.

Because Treasury failed to engage in reasoned decisionmaking, the Final Rule is invalid under the APA and no analysis of the underlying statutory interpretation is necessary. *Humane Soc'y v. Locke*, 626 F.3d 1040, 1055 (9th Cir. 2010). Treasury also forfeited *Chevron* deference when it failed to engage in a "reasoned analysis sufficient to command … deference." *Good Fortune*, 897 F.3d at 263 (internal quotation marks omitted); *see Encino Motorcars*, 136 S. Ct. at 2125.

In any event, the Final Rule fails for the independent reason that it cannot survive review under *Chevron*. Treasury's conclusion that Section 482 authorizes allocation of stock-based compensation regardless of the uniformly contrary evidence of unrelated parties' conduct "is unreasonable and cannot stand." *Good Fortune*, 897 F.3d at 261. And because the interpretation is unreasonable for *Chevron*

purposes, it is also incorrect under the *de novo* standard that properly applies here. *See Encino Motorcars*, 136 S. Ct. at 2125.

*Chevron* analysis examines the agency's construction both for "fit" with the statutory language and for "conformity to statutory purposes." *Good Fortune*, 897 F.3d at 262. Treasury's interpretation satisfies neither criterion.

### A. The purpose of Section 482 is to achieve tax parity between controlled-party transactions and uncontrolled-party transactions.

The Commissioner's insistence on a "purely internal" commensurate-with-income analysis in the context of cost-sharing, to the exclusion of the arm's-length standard, is "unreasonable in light of the statute's text, history, structure, and context." *Loving v. IRS*, 742 F.3d 1013, 1022 (D.C. Cir. 2014). Indeed, "[t]he statutory text … , the agency's own prior interpretation … , and the … legislative history, are all to the contrary." *Pac. Nw. Generating Co-op. v. Dep't of Energy*, 580 F.3d 792, 818 (9th Cir. 2009).

As the Commissioner acknowledges, the clear-reflection-of-income standard in the first sentence of section 482 permits only those allocations that place controlled entities on parity with uncontrolled

entities. Comm'r Br. 49-50 ("[C]ommercial transactions between commonly controlled entities should be priced as though the parties had been dealing at arm's length.")[5] That concession is in line with Treasury regulations that unambiguously state—as they have for decades—that "[i]n determining the true taxable income of a controlled taxpayer, the standard to be applied *in every case* is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer." Treas. Reg. § 1.482-1(b)(1) (emphasis added). *See Commissioner v. First Sec. Bank of Utah*, 405 U.S. 394, 400 n.10 (1972) (noting that regulations have "remained virtually unchanged" since 1934). That authoritative interpretation accords with the mountain of treaties, case law, regulations, regulatory pronouncements, and legislative history affirming what the statute requires. *See* Altera Br. 4-10.

The withdrawn opinion of Chief Judge Thomas nevertheless suggested that these monolithic authorities were somehow equivocal, pointing to criticism of "talismanic" reliance on the arm's-length standard in *Frank v. International Canadian Corp.*, 308 F.2d 520 (9th

---

[5] That contrasts with the Commissioner's position in the Tax Court (and rejected there) that "Treasury should be permitted to issue regulations modifying—or even abandoning—the arm's length standard." ER53.

Cir. 1962). But the criticism of the arm's-length standard in *Frank* was dictum (*see id.* at 528 (Commissioner had acceded to different standard in pretrial order)), which this Court swiftly cabined (*see* Wdwn. Op. 15 n.3 (citing *Oil Base, Inc. v. Comm'r*, 362 F.2d 212 (1966)). Since then, both Treasury and the courts have repeatedly reaffirmed the arm's-length standard. *See, e.g. Xilinx*, 598 F.3d at 1198 n.1 (arm's-length standard is the "touchstone" of tax parity); I.R.S. Notice 88-123, 1988-2 C.B. 458, 475 & n.149 (Congress "intended no departure from the arm's length standard") ("White Paper"); ER58 (collecting citations). Meanwhile, the Supreme Court has effectively overruled *Frank*. *See First Sec. Bank*, 405 U.S. at 407 (disallowing adjustment under Section 482 that allocated income that similarly situated unrelated party would not have received ). The Tax Court decisions cited in the withdrawn opinion of Chief Judge Thomas also relied on evidence of real-world conduct.[6]

---

[6] *See Seminole Flavor Co. v. Comm'r*, 4 T.C. 1215, 1233 (1945) (on "basis" of amount paid to unrelated parties for services, amount paid to related party for same services was "fair and entitled to classification as an arm's length transaction"); *Grenada Indus., Inc. v. Comm'r*, 17 T.C. 231, 258, 260 (1951) ("fair value" of services gauged by salaries paid to employees, disregarding benefits derived as equity holders); *id.* at 256

In short, Section 482 is designed to achieve clear reflection of income by imposing tax parity between related-party and unrelated-party transactions by means of the arm's-length standard.[7] That design necessarily renders relevant the evidence derived from uncontrolled-party dealings.

## B. The interpretation here is unreasonable when measured against recognized statutory meaning.

Nevertheless, the Commissioner maintains, and the withdrawn opinion of Chief Judge Thomas accepted, that the "commensurate with income" standard permits a "purely internal" analysis (Wdwn. Op. 39) that "dismiss[es]" the "behavior" of unrelated parties as "irrelevant" (*id.* at 29) in arriving at an arm's-length result. *See also id.* at 39-40. That conclusion is wrong for at least four reasons.

---

(defining "fair market prices, as though its transactions had been carried on with strangers").

[7] No principle of law allows a court to ignore an agency's acknowledgment of a statutory standard as "lip service" based on articles opining that the agency had silently "retreat[ed]" from the statutory requirement. Wdwn. Thomas Op. 17. Significantly, in the rulemaking Treasury did not hint that it was "mov[ing] away from the traditional arm's length standard" (*id.* at 31) or "attempting to synthesize the potentially disparate standards found within § 482 itself" (*id.* at 29).

***First***, by its express terms, the commensurate-with-income standard does not apply to QCSAs. The second sentence of Section 482 provides that, "[i]n the case of any transfer (or license) of intangible property … , the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." As we previously explained, this sentence does not apply to cost-sharing for the development of *new* intangibles, which are not transferred or licensed between the parties, but rather are owned upon their creation by each participant. Our brief presented this argument (at 66-68), which the *amicus* brief of Cisco Systems developed further (at 3-7), and which the withdrawn opinion of Judge O'Malley accepted (at 63). Yet the withdrawn opinion of Chief Judge Thomas did not address the argument or analyze the statutory text, but relied exclusively on legislative history. This Court "look[s] first to the words Congress used" when interpreting a statute, *Zimmerman v. Oregon Dep't of Justice*, 170 F.3d 1169, 1173 (9th Cir. 1999), as "the authoritative statement is the statutory text, not the legislative history or any other extrinsic material." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005).

The legislative history that the Preamble mentioned only in passing does not remotely justify, much less direct, the rule's modification of the arm's-length standard. Treasury makes much of a statement by the conferees that they did not intend to interfere with bona fide cost-sharing arrangements in which "the income allocated among the parties reasonably reflect the actual economic activity undertaken by each." H.R. Rep. No. 99-481, at II-638. But this statement simply reflects the reality of arm's-length cost-sharing arrangements: unrelated parties would not agree to allocate income from jointly developed intangibles in a way that over-rewarded some parties, and under-rewarded others. As Treasury itself previously acknowledged, "a transaction at arm's length naturally would reflect the 'relative economic activity undertaken.'" T.D. 8552, 1994-2 C.B. 93. The Preamble's glancing references to the legislative history provided no notice of the dramatic alteration of the arm's-length standard that the Commissioner now claims Treasury intended. Nor does the cited legislative history justify that change.

**Second**, Treasury's "purely internal" standard for stock-based compensation is not reasonable because it relies on the commensurate-

with-income amendment, which applies to transfers and licenses of intangibles between related parties, but singles out cost-sharing arrangements—which involve no transfer or license—for a categorical exception to the arm's-length standard. At oral argument, the Commissioner agreed that comparable evidence must be considered to price the licenses and transfers of intangibles that come within the explicit terms of the second sentence of Section 482. Oral Arg. Video 12:52-59. But he denied that a comparable cost-sharing arrangement between unrelated parties should be considered. *Id.* at 17:37-45.[8] In other words, the Commissioner argued that the second sentence completely displaces the first sentence only when the application of the second sentence conflicts with the statutory terms. That gives the statute the most force where it does not apply.

*Third*, it is unreasonable to read the second sentence of the statute to obliterate the first. The withdrawn opinion of Chief Judge Thomas recognized (at 13) that Section 482's first sentence, which "provides the statutory authority for the arm's length standard," "has remained substantively unchanged since 1928." As a matter of both

---

[8] To be clear, the administrative record in fact included comparable cost-sharing arrangements between unrelated parties. ER68-69.

logic and statutory interpretation, the first sentence and the later-enacted second sentence must be read together—as the Secretary recognized when he left in place the regulations requiring tax parity and mandating that the arm's-length standard apply in every case following the 1986 amendment. *See* Treas. Reg. § 1.482-1(a)(1), (b)(1). Indeed, the *only* regulation actually implementing the commensurate-with-income standard during the years at issue provided that any commensurate-with-income adjustments "shall be consistent with the arm's length standard and the provisions of § 1.482-1." Treas. Reg. § 1.482-4(f)(2)(i).

If Treasury had authority to "dispense with a comparability analysis" (Wdwn. Op. 39-40), then the Commissioner could disregard evidence of *perfect* comparables for a related-party license in favor of a "purely internal analysis"—and then pronounce his preferred allocation as an arm's-length result. But when evidence derived from uncontrolled-party dealings establishes an arm's-length result—as it did in the administrative record—it is illogical to say that a "purely internal" analysis can establish a contrary arm's-length result.

Nor can the Commissioner avoid the statutory limits on his ability to reallocate income by asserting that a related-party transaction is fundamentally different from all similar transactions between unrelated parties by virtue of the very fact that the parties are related. It is a truism that related parties, by virtue of common ownership, *always* are in a fundamentally different position than unrelated parties. The premise of the statutory reallocation authority is that Treasury may reallocate income from related-party dealings—but only to bring them into parity with unrelated-party dealings. The reallocation authority rests on two premises: (1) that related-party dealings usually involve different incentives than unrelated-party dealings, and (2) that there should be tax parity between the two types of dealings.

As contemplated by Congress and actually applied in Treasury's Regulations, the commensurate-with-income standard serves an important role in applying the arm's-length standard to transfers or licenses of intangible property. By allowing the Commissioner to consider not only *ex ante* profit expectations but also actual profit experience from the transfer or license of an intangible, the commensurate-with-income standard gives the Commissioner a

powerful tool to police the use of unrelated-party data to establish prices for intangible property transfers or licenses. Altera Br. 10-11. And by specifically allowing the Commissioner to take into account actual profits in order to periodically adjust prices based upon the evidence-based pricing methods provided in the regulations (Treas. Reg. § 1.482-4(f)(2)(i)), the commensurate-with-income standard ensures that the fact-based pricing methods produce truly comparable results. Nothing in that provision suggests a separate, "purely internal" analysis that disregards unrelated-party conduct and arrives at pricing by using considerations other than those unrelated parties use.

While Chief Judge Thomas thought this view of the commensurate-with-income standard was too "narrow" (Wdwn. Op. 43), it is precisely how Treasury implemented that standard in the Regulations. Indeed, the Regulation follows the White Paper and expressly protects taxpayers from any commensurate-with-income adjustment if they use sufficiently comparable transactions. Treas. Reg. § 1.482-4(f)(2)(ii). If Treasury thought a "purely internal" approach dispensing with arm's-length evidence were authorized, it should have subjected this view to the crucible of notice-and-comment rulemaking.

**Fourth**, Treasury's "purely internal" approach to allocation amounts to a conclusive presumption that unrelated parties would *always* share stock-based compensation costs—even though the undisputed record evidence shows that unrelated parties *never* do. That is not a reasonable interpretation of Section 482. The D.C. Circuit's opinion in *Good Fortune*—issued the same week as the withdrawn opinion—addressed a similar statute where tax treatment turned on factual questions. There, a tax exemption for foreign shippers turned on the percentage of foreign ownership and the rule categorically excluded consideration of bearer shares in testing whether the foreign ownership percentage was met. As the D.C. Circuit explained, Treasury cannot rewrite a statute by imposing an "insurmountable burden of proof—in which no amount of relevant evidence could possibly suffice." 897 F.3d at 262.

Here too, "the IRS has never made (much less adequately supported) … an absolute claim of impossibility" (*id.*) that would excuse it from considering actual evidence of arm's-length behavior to address the statutory parity requirement. *See* Altera Br. 71-72. Indeed, as the

Tax Court recognized (ER62), such a claim would be implausible and cannot sustain Treasury's statutory interpretation.

## CONCLUSION

The decision of the Tax Court should be affirmed.

Respectfully submitted,

Dated: September 28, 2018

/s/ Donald M. Falk

Thomas Kittle-Kamp
William G. McGarrity
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

Donald M. Falk
MAYER BROWN LLP
3000 El Camino Real #300
Palo Alto, CA 94306
Telephone: (650) 331-2000
Facsimile: (650) 331-2060
dfalk@mayerbrown.com

A. Duane Webber
Phillip J. Taylor
Joseph B. Judkins
BAKER & MCKENZIE LLP
815 Connecticut Avenue NW
Washington, DC 20006
Telephone:(202) 452-7000
Facsimile: (202) 452-7074

Brian D. Netter
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

*Counsel for the Appellee*

# CERTIFICATE OF COMPLIANCE

1.     Pursuant to Fed. R. App. P. 32(a) and Ninth Cir. R. 32-1, the undersigned hereby certifies that the attached brief is proportionally spaced, has a typeface of 14 points or more, and contains 6,483 words.

2.     The brief has been prepared in proportionally-spaced typeface using Microsoft Word 2007 in 14-point Century Schoolbook font. As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word-count feature of this word-processing system in preparing this certificate.


September 28, 2018          /s/ Donald M. Falk
                                    Donald M. Falk
                                    *Counsel for Altera Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on September 28, 2018.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

September 28, 2018     /s/ Donald M. Falk
           Donald M. Falk
           *Counsel for Altera Corp.*